Ethel **POTTHARST**, bringing the following class action on her own behalf, and on behalf of all other persons similarly situated, Plaintiff,

v.

**SMALL BUSINESS ADMINISTRATION,**
an agency of the United States
Government, Defendant.

Civ. A. No. 69–3030.

United States District Court,
E. D. Louisiana,
New Orleans Division.

June 23, 1971.

Joseph E. Defley, Jr., Port Sulphur, La., for plaintiff Ethel Pottharst and members of the class.

Wayne C. Guidry, New Orleans, La., for plaintiff-intervenor Hansell Lucen Chighizola.

Wayne C. Giordano, Bell Chasse, La., for plaintiffs Henry Buras, Sr., and Henry Buras, Jr.

Walter I. Lanier, Jr., Thibodaux, La., for plaintiffs Mr. and Mrs. Forest Doucet.

Agnes Mamie Laird, plaintiff in pro. per.

James D. Carriere, Asst. U. S. Atty., New Orleans, La., A. J. Barnes, Washington, D. C., for defendant.

RUBIN, District Judge:

The Southeast Hurricane Disaster Relief Act of 1965, Public Law 89–339, 79 Stat. 1301, granted relief to certain borrowers under the Small Business Act for loss sustained in Hurricane Betsy "to the extent such loss or damage is not compensated for by insurance or otherwise." Motions for summary judgment by both parties raise the single issue in this case: whether the quoted words mean "to the extent that insurance could not be obtained to cover such loss or damage" [1] or whether they mean "to the extent insurance was not actually in force even though it was obtainable."

Ethel Pottharst, suing on her own behalf, and on behalf of other persons similarly situated,[2] urges that her SBA loan should be forgiven because of losses she suffered as a result of wind damage in Hurricane Besty. She concedes that insurance against such a loss might have been obtained, but she had not bought it. She says she is entitled to relief because the statute grants relief to one whose "loss or damage [was] not compensated for by insurance or otherwise," and she is literally within that group. The Administrator of the Small Business Administration, on the other hand, has taken the position since the 1965 Relief Act was first enacted that it was intended to cover only losses of the kind that insurance companies would not cover, that is, only losses from flood, high waters, or wind-driven waters.

Mrs. Pottharst is joined as plaintiff in this action by Hansell Lucen Chighizola, who alleges in his petition of intervention that he is a member of the class whose claims are being asserted by Mrs. Pottharst, and that the SBA has refused forgiveness on a $10,000 loan Chighizola had made because of Hurricane "Betsy" wind damage to his uninsured property.

■ The entire thrust of the statutory language is to the question whether the damage was in fact compensated for. The words contain no implication that Congress intended forgiveness only for losses that were *uninsurable*. Identical words employed, for example, in the Internal Revenue Code have been interpreted as applicable to situations where no insurance was actually in effect even though it could have been obtained. See 26 U.S.C. § 1231; Federal Tax Regulation (1971) § 1.1231—1; Chewning v. Commissioner of Internal Revenue, 4 Cir. 1966, 363 F.2d 441, affirming 44 T. C. 678; Oppenheimer v. United States, W.D.Mo.1963, 220 F.Supp. 194.

And, indeed, elsewhere in the 1965 Hurricane Relief statute, reference is

---

1. See "The Hurricane Betsy Disaster Relief Act: What It Is—Who It Will Help—How They Will Benefit," an information paper published by the Small Business Administration.

2. The class has been defined, in the manner provided by Rule 23(c) of the F.R.Civ. P., as: "all those borrowers who had borrowed more than $500.00 from the Small Business Administration, and who were denied or who were otherwise not granted any forgiveness of their loans under the 'Hurricane Betsy' Relief Act

(Public Law 89–339) on the ground that their loss was an insurable loss. This class includes those who failed to apply for the forgiveness if they can establish that they were informed (by any source) that the forgiveness would be denied on the ground that their loss was uninsurable. It also includes those who were similarly denied or not granted forgiveness because they lost trailers on the ground that flood insurance could have been obtained for trailers and their contents." (Order dated November 12, 1970).

made to "uninsurable crop damage" (Section 4), thus making an apparent clear distinction between what is *uninsured* and what is *uninsurable.*

The administrator finds nought to the contrary in the statute. His argument that its words were "intended to cover only uninsurable losses and only losses from floods, high waters, or wind-driven waters," is supported only by his own assertion, boldly made, shortly after the act was adopted, and by his reliance on the legislative history.

"But this is a case," as Justice Frankfurter wrote in Greenwood v. United States, 1956, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412, "for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." For, as the Supreme Court said in United States v. Great Northern Ry. Co., 1952, 343 U.S. 562, 575, 72 S.Ct. 985, 993, 96 L.Ed. 1142 "It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written." In matters of statutory construction the duty of this Court is to give effect to the intent of Congress, and in doing so our first reference is of course to the literal meaning of words employed.

Had Congress intended to limit relief to losses for which insurance could not have been bought, it could have used the simple language of Section 4, also used by the Administrator in his directives: "uninsurable" loss.

The Administrator relies on the fact that Senator Long, who sponsored the bill, testified before the Committee on Public Works of the House of Representatives, that its purpose was to "help us with * * * the type disaster that is uninsurable." And the Senate Committee on Public Works reported, "[T]he committee understands the assistance here is for an uninsurable risk rather than for those who failed to have insurance through their own neglect." But this relief measure, sponsored by Senator Long for the benefit of the distressed people of Southern Louisiana, Mississippi, and Florida should be read in the broad light of its evident humanitarian purposes, not restrictively in the narrow beam of an excerpt from Senatorial debate.

The fact that the language of the statute might benefit those who had no insurance, even though it was available, was recognized when President Johnson signed the act into law on November 8, 1965. He then said:

"The legislative history of this act makes it clear that both the Senate and the House of Representatives desired to give special assistance to those victims of the hurricane who suffered losses for which no insurance was obtainable. Accordingly, *within certain limitations* the act permits a person who receives a disaster loan from the Small Business Administration or an emergency loan from the Farmers Home Administration, because of loss or damage resulting from Hurricane Betsy, to obtain a cancellation of part of the principal, or a waiver of part of the interest, due from him under the loan agreement. *One of the most important of these limitations is that this relief will be given only in the case of uninsurable loss or damage—* such as that resulting from flood, high water, or wind-driven water. *It cannot be extended, nor should it be, to those who did not take advantage of available insurance protection."* [Emphasis supplied.] Statement of President Johnson, November 8, 1965. Public Papers of the Presidents, Lyndon B. Johnson, 1965, Volume II, page 1106 (published by U. S. Govt. Printing Office, Washington, D. C., 1966).

But the President could not by this statement change the words of the statute from losses "not compensated for by insurance or otherwise" to losses "for which no insurance was obtainable."

The ultimate disproof of the Administrator's argument is that the identical words were used in The Disaster Relief

Act of 1969,[3] and the Administrator interpreted these words to require relief both for loans that were uninsured as well as those that were uninsurable.[4] The suggestion that the self same words in two statutes having like objectives were intended by Congress to mean something entirely different is little more than fictitious. If it be true, as the SBA suggests in a supplementary brief, that it interpreted the later law differently because of experience gained in the interim, there is no reason why that experience should not have been utilized to change its earlier erroneous interpretation of the 1965 Act.

In the exegesis of scripture as well as of statute, it has long been recognized that "the letter killeth but the spirit giveth life." 2 Corinth. 3:6. The law reports are full of cases deploring excessive literalism in statutory interpretation.

But here a literal interpretation of the statute accords with its humanitarian objectives, and letter and spirit provide the same illumination. Legislative history is the only guide we have when the meaning of a statute is unclear or when its words seem to contradict its purpose. But when the compass of the statutory language is clear, the court charged with its interpretation is certain to be lost should it abandon this clear pointer to explore the shifting course of legislative history, statements to committees, and arguments on the Senate floor. Neither President Johnson's message, nor the Committee report, was voted on by the members of the Houses of Congress.

What they had before them was the statute. As legislative language goes, this was remarkably lucid. Sufficient guide is furnished here by the Supreme Court's words in Ex Parte Collett, 1949, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207:

"Petitioner's chief argument proceeds not from one side or the other of the literal boundaries of [the statute] but from its legislative history. The short answer is that there is no need to refer to the legislative history where the statutory language is clear. 'The plain words and meaning of a statute cannot be overcome by * * * legislative history * * *' This canon of construction has received consistent adherence in our decisions." See also Gemsco, Inc. v. Walling, 1945, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921.

The defendant's other arguments can be dealt with briefly. The first is that this is an unconsented suit against the United States. In the original action, Mrs. Pottharst sought an injunction. When the defendant argued that her injunction suit was an unconsented action against the United States, her complaint was amended to seek both declaratory and monetary relief.

■ Congress has granted authority for the Administrator of the Small Business Administration to sue and be sued in 15 U.S.C. § 634(b), providing, by way of limitation, that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property." There is therefore express statu-

---

3. "In the administration of the disaster loan program under section 7(b)(1) of the Small Business Act, as amended (15 U.S.C. § 636(b)), in the case of property loss or damage in any affected State resulting from a major disaster the Small Business Administration—
   (1) to the extent such loss or damage *is not compensated for by insurance or otherwise*, (A) shall at the borrower's option on that part of any loan in excess of $500 cancel (i) the interest due on the loan, or (ii) the principal of the loan, or (iii) any combination of such interest or principal except that the total amount so canceled shall not exceed $1,800, and (B) may defer interest payments or principal payments, or both, in whole or in part, on such loan during the first three years of the term of the loan without regard to the ability of the borrower to make such payments. * * *" (Public Law 91–79; 83 Stat. 125 (1969)).

4. Letter to the Court from A. James Barnes, Attorney, United States Department of Justice, Washington, D.C., dated June 8, 1970.

tory authority for declaratory and monetary relief.

It was also suggested that the complaint failed to allege jurisdictional facts on its face, but this has been suppled by the amended complaint.

■ Finally it is suggested that, because the 1965 Act has terminated and has been replaced by the later Act, plaintiffs are no longer entitled to relief. This is apparently based on the theory that it was optional with the Administrator to grant or deny relief. But the Act provides that the Small Business Administration "shall at the borrower's option" grant relief. These are the words customarily used by Congress to compel action. They do not leave the matter of relief to the Administrator's discretion.

Counsel for plaintiffs are entitled to a reasonable attorney's fee, which I determine to be 10% of the amount recovered in each case. Plaintiffs' counsel contends, however, that this fee should be withheld from the individual plaintiffs, and, as to those plaintiffs who are due no cash refund, the government should pay an attorney's fee and add it to the amount due by that plaintiff.

The Anti-Assignments of Claims Act, 31 U.S.C. § 203, provides in pertinent part:

"All transfers and assignments made of any claim upon the United States * * * shall be absolutely null and void, unless they are freely made and executed * * * after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof."

■ Counsel for plaintiff has cited no authority, and I have found none, that permits me to order the government to pay a lawyer the fees due by some-

one who owes the government money and add it to the amount due.

The defendant has agreed to forward refund checks for those plaintiffs entitled to a refund to the plaintiffs' respective counsel; this will permit counsel to collect his fee directly from the client.

But no payment can be made to (or for and benefit of) those plaintiffs who are not entitled to receive any payment because their loans are not yet paid and the balance owing by them exceeds the amount of relief that they are due. These borrowers are entitled only to a *credit* against outstanding indebtedness. Since no payment of funds to the plaintiffs is involved, the defendant rightly argues that the warrant for payment required by the statute as a condition precedent to any assignment cannot issue.

To compel the defendant to pay to counsel 10% of the credit allowed to those plaintiffs would unjustifiably shift to the defendant the burden and risk of collecting counsel fees from the plaintiffs.

Accordingly, the defendant's motion for summary judgment will be denied, and the plaintiffs' motion for summary judgment will be granted, to the extent of the monetary relief prayed for by the plaintiffs. After consultation with the plaintiff concerning the members of the class likewise entitled to monetary relief, and the form of judgment, the defendant is directed to prepare and submit to the court a proposed form of judgment, with a copy to counsel for the plaintiff. If the parties are unable to agree on a form of judgment the court will schedule argument with respect to its scope, contents and form. Upon rendition of formal judgment, the defendant will send notice of judgment together with a form for application for refund or credit due to all members of the class of plaintiffs.